[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12935
_____

D.C. Docket No. 9:17-cv-80221-RLR


JOAN E. FRIEDENBERG,
on behalf of herself and a class of similarly situated individuals,

Plaintiff-Appellant,

versus

SCHOOL BOARD OF PALM BEACH COUNTY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(December 20, 2018)

Before ED CARNES, Chief Judge, MARCUS, and EBEL,[*] Circuit Judges.

MARCUS, Circuit Judge:

A suspicionless search by the government is presumptively unconstitutional. So goes the basic hornbook law of the Fourth Amendment. The details are a bit more complex. Suspicionless searches are permissible in a narrow band of cases where they serve sufficiently powerful and unique public needs. The force of these needs depends heavily on the context in which the search takes place.

At issue today is a matter of first impression -- whether a county school board may require all applicants for substitute teacher positions to submit to and pass a drug test as a condition of employment. That is, to put it more directly, whether the Palm Beach County School Board (the "School Board") may, without any suspicion of wrongdoing, collect and search -- by testing -- the urine of all prospective substitute teachers. We think that the School Board has a sufficiently compelling interest in screening its prospective teachers to justify this invasion of the privacy rights of job applicants, and thus conclude that the School Board has not violated the constitutional mandate barring unreasonable searches and seizures. As we see it, ensuring the safety of millions of schoolchildren in the mandatory supervision and care of the state, and ensuring and impressing a drug-free

---

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

environment in our classrooms, are compelling concerns. Because we recognize today a special need to conduct such testing, and because the balance of interests weighs heavily in its favor, we hold that the suspicionless testing of substitute teacher applicants in Palm Beach County is permissible and affirm the district court's denial of a preliminary injunction.

## I.

## A.

Joan Friedenberg applied for several advertised positions -- tutor, substitute teacher, and early childhood aide -- in the Palm Beach County School District. Among other things, the online application required Friedenberg to agree to be tested for drugs. In February 2017, Friedenberg received a conditional offer to become a substitute teacher. She was told, however, that she would need to be fingerprinted -- for a full background check -- and would need to pass a drug test before she could be officially hired. Friedenberg was fingerprinted but refused to submit to drug testing.

Since our constitutional analysis depends in substantial measure on the specific facts and the unique circumstances found in our public schools, we are obliged to examine closely the testing protocol adopted by the School District, the efficacy of the testing regime, and the duties and responsibilities of substitute public school teachers. The drug testing was required under the School District's

"Drug and Alcohol-Free Workplace" policy, which provides for drug testing to be performed in conformity with Florida's Administrative Code. See Fla. Admin Code. R. 59A-24.005(3). The policy required, among other things, pre-employment drug testing of all job applicants. The relevant provision read this way:

> Pre-employment screening will be required of all applicants before employment with the District. Any applicant who tests positive in the pre-employment screening for a drug as defined in this Policy will not be hired and is not eligible to re-apply for employment with the District for one year following the confirmed positive test.

The School District has a separate policy requiring suspicionless drug testing of those employees and volunteers who perform "safety-sensitive functions," mostly involving the operation of commercial vehicles.[1]

Under the pre-employment drug-testing policy, the applicant typically provides a urine sample in the privacy of a bathroom stall. Fla. Admin Code. R. 59A-24.005(3). While the applicant provides the sample, collection site staff remain in the room, but outside the stall. Fla. Admin Code. R. 59A-24.005(3)(c)(7). Before collection, applicants are asked to wash their hands, empty their pockets, remove outer clothing, and place all personal belongings aside. Fla.

---

[1] In relevant part, the safety-sensitive employee testing policy provides that "[a]ll applicants for employment in any covered position safety-sensitive position [sic] . . . shall undergo drug and alcohol testing as a condition precedent to employment . . . . Any applicant who tests positive in the pre-employment screening . . . is not eligible for employment with the District."

4

Admin Code. R. 59A-24.005(3)(c)(5)–(6).  A wallet may be kept, but staff may search it for contaminants.  Fla. Admin Code. R. 59A-24.005(3)(c)(5).  After collection, the testing staff observe the urine sample for evidence of tampering.  Fla. Admin Code. R. 59A-24.005(3)(c)(12).  If tampering is suspected, a supervisor may approve collection of a second sample under direct observation by a person of the same gender as the applicant.  Fla. Admin Code. R. 59A-24.005(3)(c)(13).  Drug-tested applicants are also required to disclose all medications they are taking before being tested.

Select information from the drug testing is reported to the School Board.  Among other things, positive test results, including the substance or substances for which the specimen tested positive, are reported.  The reports also indicate whether an individual refused testing or left the testing site.  Five individuals within the School Board's Department of Risk and Benefits Management receive this information.  The results are held in a "confidential electronic medical folder" and are <u>not</u> reported to any law enforcement official.  The hiring school site or department is informed only that the applicant did not pass a medical examination.  Moreover, self-disclosed information about medications is seen only by the collection staff and a review officer -- a position the District outsources.

Testing under this policy has revealed relatively few positive results.  In 2016, 4,965 job applicants were subject to the District's pre-employment

5

screening.  Of that total, forty individuals were disqualified by testing positive or failing to submit to the drug test.  The disqualifications included thirty-three positive tests and seven individuals who refused to take the test or left the testing site.  That is, of 4,958 job applicants who submitted to drug testing, 0.67 percent tested positive.  Twenty-seven of the thirty-three positive tests were positive for marijuana; three more were positive for benzodiazepines (antianxiety drugs), two for cocaine, and one for opiates.

Among the forty job applicants disqualified by the drug testing regime were twenty-five applicants for noninstructional roles and fifteen applicants for instructional roles, including six substitute teacher applicants.  Of the six disqualified substitute teacher applicants, four tested positive for marijuana, one tested positive for cocaine, and one refused to take the test.  Eleven of the forty disqualified applicants began work with the District and worked for some time before the results of the drug test disqualified them, including three teachers and a coach.  Notably, the record does not reflect how many applicants for substitute teachers -- or how many applicants for instructional positions -- were tested of the total number of job applicants tested during the 2016 year.  Nor is there any empirical data addressing how many would-be applicants for instructional positions were deterred by the County's drug-testing regime.

6

The typical workday of a substitute teacher in the School District includes five to six hours of classroom time, generally alone with students.  Before the school day, substitute teachers check in and are seen by others, such as a school principal, in the school office; they also check out at the office at the end of the day.  During the day, substitutes may be monitored by supervisors or by other teachers through classroom visits or perhaps when taking students to lunch, recess, or other locations.  Substitute teachers also have a variety of safety-related responsibilities which include monitoring students for safety purposes, such as preventing or stopping fights; reporting and addressing hazards or other unsafe circumstances; detecting and promptly responding to student health issues; detecting and reporting student drug use or possession; and reporting suspected child abuse.  As the Chief of the County's school district police explained, school personnel, including substitute teachers, are "on the frontlines of securing the campus and are often the first responders to any given incident."

According to the School District's Substitute Teacher Handbook, a substitute teacher's specific responsibilities include addressing student behavior and emergencies.  Thus, for example, any complaint about student illness "should receive immediate attention."  Student accidents must be reported immediately as well.  And control of the classroom is characterized as "a primary concern."  The Handbook further provides: "It is [the substitute teacher's] responsibility to discuss

7

any limitation or restriction with the substitute contact before [the substitute teacher] begin[s] the assignment so that [the substitute teacher] will be prepared to provide safety and accountability for students in any situation and at all times." And the Handbook says that substitutes are "as legally responsible for students, equipment, and materials as is the regular teacher."

B.

In February 2017, Friedenberg sued the School Board in the United States District Court for the Southern District of Florida, claiming that the requirement of suspicionless drug testing of School District employment applicants violated the Fourth Amendment. She sought class action relief, describing the putative class as including "[a]ll job applicants for non-safety-sensitive positions with the Palm Beach County School District." Friedenberg sought declaratory and injunctive relief.

Friedenberg moved the district court for preliminary injunctive relief, arguing, among other things, that she could establish a substantial likelihood of success on the merits. After conducting a hearing, the district court denied preliminary injunctive relief. As an initial matter, the district court determined that Friedenberg had established standing to challenge only the application of the drug-testing policy to substitute teachers, not as to all School District employment applicants. Therefore, the court addressed only suspicionless drug testing of

8

substitute teacher applicants. The district court also concluded that the School Board had established a special need to conduct suspicionless drug testing of substitute teacher applicants. It explained that even "a momentary lapse of attention . . . could be the difference between life and death," and that while "the magnitude of the public safety risk presented by an impaired teacher is not comparable to that presented by an impaired railway operator or armed customs official," the special responsibility of substitute teachers for "the care of society's most vulnerable members" was distinct and notable.

The district court then determined that the balance of interests strongly favored the policy of suspicionless testing of substitute teacher applicants. And though Friedenberg's privacy interests were implicated in the testing regime, the district court concluded that the urinalysis was a "relatively noninvasive" process and the testing regime was "not unduly intrusive." The court found that "although the efficacy of the scheme is not beyond question, the need asserted by [the School Board] -- the protection of the children under a substitute teacher's charge -- is compelling indeed." Accordingly, Friedenberg had not established a substantial likelihood of success on the merits.

Friedenberg then filed this interlocutory appeal.

9

II.

We review the denial of a preliminary injunction for abuse of discretion. See, e.g., Siegel v. LePore, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc). A preliminary injunction may be entered when a plaintiff establishes four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002) (citing Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001)). Here the district court determined that a preliminary injunction was not warranted because Friedenberg had not shown a substantial likelihood of success on the merits. The heart of this dispute surrounds whether, on this preliminary record, there is a substantial likelihood that the drug testing policy violates the Fourth Amendment. We hold that there is not.

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Undeniably the school district's urinalysis drug tests are searches that implicate the Fourth Amendment. See, e.g., Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989). We consider whether the search is a reasonable one.

10

"The default rule in this context . . . is that 'to be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing.'"  AFSCME v. Scott, 717 F.3d 851, 866 (11th Cir. 2013) (quoting Chandler v. Miller, 520 U.S. 305, 313 (1997)).  However, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance."  Von Raab, 489 U.S. at 665.  The Supreme Court has developed a narrow exception to the Fourth Amendment expectation of individualized suspicion where a search "serves special governmental needs."  Id.; Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (search made without individualized suspicion of wrongdoing can be reasonable "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable" (quotation omitted)).  The special need must raise a "concern[] other than crime detection," and in order to satisfy the Fourth Amendment, the special need must be "substantial -- important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."  Chandler v. Miller, 520 U.S. 305, 314, 318 (1997).

When a special need is claimed, we are obliged to "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties."  Id. at 314.  And "[i]n limited circumstances, where the

11

privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. 602, 624 (1989).  As we wrote in AFSCME v. Scott, 717 F.3d 851 (11th Cir. 2013), a "'compelling state interest,' in the Fourth Amendment context, [does not describe] a fixed, minimum quantum of governmental concern." Id. at 717 F.3d at 867 (quotations omitted).  Resolving a case like this one requires identifying what interest the government has, then measuring the weight of that interest and, eventually, balancing it against other factors.  See id.

Our consideration of the merits then is twofold.  Once a plaintiff has shown that the government conducted a search without individualized suspicion -- which the School Board concedes -- the burden shifts to the government to establish that it has a "special need" sufficient to warrant departure from the Fourth Amendment's baseline requirement of individualized suspicion. See Id. at 880.  If a special need is presented, we "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties to determine the reasonableness of the search." Lebron v. Sec'y, Fla. Dep't of Children & Families, 710 F.3d 1202, 1207 (11th Cir. 2013) (quotation omitted). At this balancing stage, "the ultimate burden of persuasion remains squarely on the

12

plaintiff." AFSCME, 717 F.3d at 880. On this record, and in the unique context of public schools, we are satisfied that the School Board's testing regime as applied to substitute teacher applicants is a reasonable one, and the district court committed no abuse of discretion in denying a preliminary injunction.

### III.

Neither the Supreme Court nor this Court has ever faced the question whether there is a sufficiently compelling need to justify the invasion of privacy entailed in suspicionless drug testing of public school teachers. But we are not writing on a blank slate. The Supreme Court has considered the constitutionality of suspicionless drug-testing regimes five times in the past thirty years. It has found special needs compelling enough to permit suspicionless drug testing of public school students participating in extracurricular activities and also of government employees whose work implicates public safety.

### A.

For our purposes, the relevant precedent begins with the Supreme Court's declaration that, for Fourth Amendment purposes, public schools are unique. In New Jersey v. T.L.O., 469 U.S. 325 (1985), the Court set out as a foundational principle that "[a]lthough the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." Id. at 337. In that case, a student had

13

been caught smoking in a school lavatory and a school administrator had searched her purse. Id. at 328. It will come as no surprise that the administrator, an Assistant Vice Principal, had not sought or obtained a warrant before performing this search. See id. The Assistant Vice Principal was a state actor and the Fourth Amendment was applicable to this warrantless search, see id. at 336, but the Court held that the search was constitutional, id. at 332–33.

The Court weighed the student's privacy interests against "the school's equally legitimate need to maintain an environment in which learning can take place." Id. at 340. Students had "perfectly legitimate reasons" to bring personal property to school, and to expect some level of privacy against searches of that property. See id. at 338–39. Notwithstanding "the difficulty of maintaining discipline in the public schools," "the situation [was] not so dire" that schools would be treated, for Fourth Amendment purposes, like prisons, and students treated like prisoners who had no "legitimate expectations of privacy." Id. at 338 (noting that a prisoner's interest in privacy was negligible when compared to the government interest in preserving order in prisons) (quoting Ingraham v. Wright, 430 U.S. 651, 669 (1977)). School officials, nonetheless, had a "substantial interest . . . in maintaining discipline in the classroom and on school grounds." Id. at 339. To do this required "close supervision" and "the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." Id.

14

Balancing these competing values, the Court determined that the need for school administrators to preserve order tipped the scales against the student's interest in privacy. See id. at 340–43. Students would not be stripped of their privacy interests under the Fourth Amendment, but their rights would be less robust than a typical adult's right to be free from a search by a typical government agent. At the core of the Court's holding was "the need to maintain an environment in which learning [could] take place." Id. at 340. The school setting itself "require[d] some easing of the restrictions to which searches by public authorities are ordinarily subject." Id.

Going forward, the Court has taken to describing contexts, like schools, where the warrant requirement has been relaxed, as presenting "special needs." This terminology was coined by Justice Blackmun, concurring in the judgment in T.L.O., who described the school setting as among "those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable . . . ." Id. at 351 (Blackmun, J., concurring in the judgment). Justice Blackmun's terminology was adopted by a majority of the Court in O'Connor v. Ortega, 480 U.S. 709 (1987), which held that "special needs" were also present in government workplaces. Id. at 725 (plurality opinion); id. at 732 (Scalia, J., concurring in the judgment). There, a plurality held that public employers could

15

conduct searches of employees' offices, desks, filing cabinets, and the like, without warrants. See id. at 725–26 (plurality opinion). If a public employer intruded on an employee's protected privacy interest through a "legitimate work-related" search or an "investigation[] of work related misconduct," the employer's search "[would] be judged by the standard of reasonableness." Id. at 725. Later that same Term, the Court found that "special needs, beyond the normal need for law enforcement" also justified reasonable, warrantless searches of a probationer's home by probation officers. See Griffin, 483 U.S. at 875–76.

The "special needs" that justified warrantless searches in schools returned in two drug-testing cases that are highly instructive for our analysis today. In the first of these, Vernonia School District 47J v. Acton, 515 U.S. 646 (1995), the Supreme Court considered suspicionless drug testing of student athletes in an Oregon public school district. The district, after observing an increase in drug use and drug-related problems among the student body, had required all students participating in school athletics to take drug tests. Id. at 649–50. The Court upheld this testing regime as constitutional. Id. at 666. Citing T.L.O., the Court emphasized that it had previously "found . . . 'special needs' to exist in the public school context." Id. at 653 (citing T.L.O., 469 U.S. at 340–41). These special needs were critical for the Court, which observed in no uncertain terms that "Fourth Amendment rights . . . are different in public schools than elsewhere." Id. at 656. In the end,

16

the Court concluded that the school context was determinative.  Id. at 665 ("We caution against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts.  The most significant element . . . [is] that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care.").

Vernonia's reasoning differed from T.L.O.'s, though, in that Vernonia also focused on the status of students, who it identified as "(1) children, who (2) have been committed to the temporary custody of the State as schoolmaster."  Id. at 654.  Children "lack some of the most fundamental rights of self-determination" and "are subject . . . to the control of their parents or guardians."  Id.  School teachers and administrators "stand in loco parentis over the children entrusted to them."  Id. at 654.  They exercise a "degree of supervision and control that could not be exercised over free adults."  Id. at 655.

While "reasonableness" remained the touchstone for measuring the lawfulness of a Fourth Amendment search, the school setting and the status of students informed what would be reasonable: "the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children."  Id. at 656.  In schools, students "have a lesser expectation of privacy than members of the population generally," and student athletes could expect even less privacy than

17

typical students.  Id. at 657 (quoting T.L.O., 469 U.S. at 348 (Powell, J., concurring)).  The Court considered the government's interest in deterring drug use by schoolchildren and the efficacy of this testing regime in furthering that interest.  See id. at 661–64.  Ultimately, "the relevant question is whether the search is one that a reasonable guardian or tutor might undertake."  Id. 665.

Seven years later, in Board of Education v. Earls, 536 U.S. 822 (2002), the Supreme Court once again upheld suspicionless drug testing of public school students.  This time, the policy in question provided for suspicionless drug testing of all students participating in any competitive extracurricular activities -- not just athletics but "the Academic Team, Future Farmers of America, Future Homemakers of America, band, choir, pom pon, [and] cheerleading."  Id. at 826.  These students were "required to take a drug test before participating in an extracurricular activity, [and had to] submit to random drug testing while participating in that activity."  Id.  Once again, the Court emphasized the unique setting of our public schools for Fourth Amendment purposes.  Id. at 830.  Looking to Vernonia and T.L.O., the Court reiterated that "Fourth Amendment rights are different in public schools."  Id. at 829–30 (quoting Vernonia, 515 U.S. at 656) (alteration adopted).  Indeed, again in Earls, "the context of the public school environment serve[d] as the backdrop for the analysis of the privacy interest at stake and the reasonableness of the drug testing policy in general."  Id. at 830.

And still again the Supreme Court concluded that our public schools had a sufficiently compelling interest in the prevention and deterrence of student drug use to create a "special need" for Fourth Amendment purposes. Id. at 838.

The Court elaborated on the unique nature of the school setting. Students have reduced privacy interests "in a public school environment where the State is responsible for maintaining discipline, health, and safety." Id. at 830. Schools have a responsibility to maintain control, drawn from the need to educate and to create an environment conducive to learning. Id. at 831 (quoting New Jersey v. T.L.O., 469 U.S. 325, 350 (1985) (Powell, J., concurring)). Just as in previous cases, the Court considered "the nature of the privacy interest," id. at 830, and "the character of the intrusion," id. at 832, as balanced against "the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them," id. at 834. And just like in T.L.O. and Vernonia, the warrantless searches passed constitutional muster. Id. at 838.

### B.

In two cases that arose outside the school context, the Court identified still other versions of "special needs," and made it abundantly clear that adult government employees in some safety-sensitive positions could be required to pass suspicionless drug tests as a condition of their employment.

19

The first of these cases was Skinner v. Railway Labor Executives Ass'n, 489 U.S. 602 (1989). There, the Supreme Court concluded that the government had a sufficiently compelling reason to test railroad employees who had been involved in railroad accidents,[2] because "[t]he Government's interest in regulating the conduct of railroad employees to ensure safety . . . present[ed] special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." Id. at 620. Evidence had established that "on-the-job intoxication was a significant problem in the railroad industry," and that in about a decade, there had been twenty-one significant accidents causing deaths and injuries that had involved alcohol or drug use. Id. at 607. The delay imposed by a warrant requirement would frustrate detection of misconduct because alcohol and certain other drugs would leave the bloodstream before they could be detected. See id. at 623. Skinner established the basic proposition that the government had an important interest in safety because the protection of life and property depended on railroad employees working effectively. Id. at 620.

Though the Court did not speak in comparative terms, the "special needs" presented in Skinner carried, in some ways, higher stakes than those the Court had

---

[2] Technically, the drug tests at issue in Skinner were required and performed by private employers -- railroad companies -- but were conducted in accordance with regulations governing these employers that had been promulgated by the Federal Railroad Administration. See Skinner, 489 U.S. at 608–12; 614–16. There were sufficient indicia of "the Government's encouragement, endorsement, and participation [in the testing regime]," and thus the Fourth Amendment was implicated. Id. at 615–16.

identified in the school cases. The railroad employees were "engaged in safety-sensitive tasks" and the testing regime served not just to maintain order or promote a particular type of environment, but to "prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs." Id. at 620–21 (quoting 49 C.F.R. § 219.1(a) (1987)). These employees "discharge[d] duties fraught with such risks of injury to others that even a momentary lapse of attention c[ould] have disastrous consequences." Id. at 628. Moreover, the employees had diminished privacy expectations because of "their participation in an industry that is regulated pervasively to ensure safety." Id. at 627. Those in safety-sensitive roles could "cause great human loss" if impaired by drug or alcohol use, and impairment might not be outwardly apparent before a serious incident occurred. Id. at 628. Accordingly, "the Government's compelling interests outweigh[ed] privacy concerns." Id. at 633.

On the same day Skinner was handed down, the Supreme Court also upheld the suspicionless urine testing of two distinct groups of safety-sensitive Customs Service employees: those applying for positions directly involved in drug interdiction and those applying for positions that would require carrying a firearm. Von Raab, 489 U.S. 664. Testing was performed after qualification for the position but before beginning in either role. Id. at 661. The testing regime, the government urged, was about both prevention and deterrence. It was meant "to

21

deter drug use among those eligible for promotion to sensitive positions . . . and to prevent the promotion of drug users to those positions." Id. at 666. These dual needs "present[ed] a special need that may justify departure from the ordinary warrant and probable-cause requirements" of the Fourth Amendment. Id.

Von Raab relied heavily on the unique functions performed by these Customs employees. Id. at 668. Customs employees did not all face the moment-to-moment life-and-death situations that railroad employees did, but, the Customs Service was, as the Court put it, "our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population" -- drug smuggling. Id. The Supreme Court suggested that employees involved in drug interdiction could be tested because drug users would be "unsympathetic to their mission of interdicting narcotics," or might even actively participate in a drug trafficking scheme. Id. at 670. These employees also were at risk of physical violence by traffickers, temptation from access to seized drugs, and susceptible to being targeted for bribery. Id. at 669. The government thus had a "compelling interest" in ensuring that those employees were "physically fit, and [had] unimpeachable integrity and judgment." Id. at 670. Moreover, employees whose jobs required them to carry firearms "discharge[d] duties fraught with such risks of injury to others that even a momentary lapse of attention c[ould] have disastrous consequences." Id. (quoting Skinner, 489 U.S. at 628).

22

The Court concluded that, when balancing the interests involved, "the Government's need to conduct the suspicionless searches . . . outweigh[ed] the privacy interests of employees engaged directly in drug interdiction, and of those who otherwise are required to carry firearms." Id. at 668.  Like the employees in Skinner, Customs Service employees entering these specialized roles had diminished expectations of privacy because they could reasonably expect they would be subjected to additional precautions and inquiries. Id. at 672.  While collecting urine could be a "substantial" invasion of privacy in other settings, the workplace can "render entirely reasonable certain work-related intrusions . . . that might be viewed as unreasonable in other contexts." Id. at 671.  The "compelling interests in safety and in the integrity of our borders" outweighed the privacy interests implicated, and so the testing was found to be reasonable. Id. at 672, 677.

In this Court, we've said that "the principle we draw from Skinner is that government employees engaged in safety-sensitive tasks . . . may be subject to suspicionless drug testing." AFSCME, 717 F.3d at 867 (quotation omitted and alteration adopted).  The same principle could be discerned from Von Raab, applied in that instance to a different set of employees engaged in safety-sensitive tasks.  Overall, these "safety-sensitive" cases "conducted the special-needs balancing test . . . in a fact-intensive manner that paid due consideration to the characteristics of a particular job category (e.g., the degree of risk that mistakes on

23

the job pose to public safety), the important privacy interests at stake, and other context-specific concerns." AFSCME, 717 F.3d at 873.  In AFSCME v. Scott, 717 F.3d 851 (11th Cir. 2013), we required the State of Florida to make a similarly "specific showing" of special needs for any category of state employee that it wanted to subject to mandatory suspicionless drug testing.  See id. at 882 (rejecting as overbroad a state executive order requiring all state agencies to test all employees, see id. at 858, 882–83).

Only one time has the Supreme Court struck down a suspicionless drug-testing regime as being unreasonable.  In Chandler v. Miller, 520 U.S. 305 (1997), Georgia had required candidates for elected state offices to certify that they passed a test for illegal drugs.  Id. at 309.  The Court held that this policy did "not fit within the closely guarded category of constitutionally permissible suspicionless searches."  Id.  Georgia asserted that drug use would "draw[] into question an official's judgment and integrity," would "jeopardize[] the discharge of public functions," and would "undermine[] public confidence and trust in elected officials," id. at 318, but the Court rejected the idea that these concerns presented a "special need" substantial enough to justify suspicionless, warrantless searches. None of the reasons offered established "any indication of a concrete danger" or demonstrated that the "hazards . . . are real and not simply hypothetical."  Id. at 319.  There was no history of an ongoing problem with drug abuse, which,

24

although not strictly necessary, "would shore up an assertion of special need" by helping clarify "the precise hazards posed." Id. There was "no reason why ordinary law enforcement methods would not suffice to apprehend such addicted individuals." Id. at 320. And there was little reason to think that anyone but the "prohibitively addicted" would actually be ensnared by the test. Id.

## C.

In short, Supreme Court precedent boils down to this: searches must be reasonable; to determine whether a warrantless search is reasonable, we consider whether the government has demonstrated a "special need" to circumvent the warrant requirement, and, if so, we weigh this against the public and private interests at stake. See Lebron, 710 F.3d at 1206–07. This calculus is highly dependent on the context of the search and the status or role of the person being searched, and it plays out uniquely in schools, where teachers and administrators have a "legitimate need to maintain an environment in which learning can take place." T.L.O., 469 U.S. at 340; see id. at 340–43; see also Earls, 536 U.S. at 831 ("Securing order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults."). In many circumstances, students in schools can be required to take drug tests because of the unique context of the school and because teachers and administrators are responsible for their wellbeing. See Earls, 536 U.S. at 838. Still another line of

25

cases tells us that where drug use or intoxication would present a significant risk to public safety, adult employees in safety-sensitive positions may be tested. Chandler, 520 U.S. at 323. The testing regime instituted by the School Board of Palm Beach County implicates the entirety of the Court's precedent and requires that we synthesize the cases addressing searches in schools with those addressing safety-sensitive positions.

## IV.

To determine whether the government has demonstrated a "special need" justifying a departure from probable cause and warrant requirements, we first evaluate the danger against which the testing regime is intended to guard; that is, the danger posed by drug-addicted teachers in the classroom. We conclude that a special need is evident. The danger posed by intoxicated teachers is significant and it is "readily apparent" that the School Board "has a compelling interest in ensuring" that teachers -- including substitutes -- are not habitual drug users. Von Raab, 489 U.S. at 670; cf. id. ("It is readily apparent that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment.").

The School Board asks us to hold that substitute teachers occupy uniquely safety-sensitive positions or, alternatively, that that the public school context gives rise to a powerful need to protect students. We agree with the bottom line that a

"special need" is present in this case, but would formulate it somewhat differently, as an intersection of the two possibilities, rather than as a direct outgrowth of one or the other. Teachers do not sacrifice as many rights upon entering a school as students do; and instructing schoolchildren is not as safety-sensitive as operating a railroad. Nonetheless, we find that, in the unique Fourth Amendment context of a public school, teachers are in a sufficiently safety-sensitive position so that guaranteeing a safe and effective learning environment presents a compelling need to justify suspicionless drug testing.

In order to evaluate the danger posed by substitute teacher drug use, we begin with the long-accepted notion that danger is measured by how likely it is that harm will occur and how serious that harm will be if it does occur. Here, the first variable, the probability of harm, is itself a function of the likelihood that a teacher will be intoxicated and the likelihood that a dangerous situation will arise. In most instances, one or the other would not, alone, cause the type of harm we see as relevant here. Our calculation does not end with this figure, though. As Judge Learned Hand famously put it, negligence is determined not just by the probability of harm but also by "the gravity of the resulting injury." United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947). The danger, then, against which the testing regime is intended to guard may be measured by (a) the likelihood that a teacher will be intoxicated; (b) the likelihood that a dangerous and urgent situation

27

will arise in school to which that teacher cannot effectively respond; and (c) the gravity of harm that would occur if that teacher fails to respond effectively. While the first of these probabilities may not be particularly high, a serious danger is nonetheless present because the second and third are quite high indeed.

To state the obvious, our schools have a singular custodial and tutelary responsibility for our nation's most precious resource -- our children. Parents are compelled, under force of law, to place their children in the care of the schools. Our teachers -- substitute or otherwise -- are directly given the responsibility to ensure the safety and protection of our children. Each family sending a child into the care and custody of the schools is counting on these teachers not only to educate them, but to keep them safe. It is to them that we look to safeguard the classroom and protect our students. Like teachers, substitute teachers are on the front lines. After all, students are at school all day long. Teachers have close interaction with students as young as five and as old as eighteen for the better part of every school day for many years of their lives.

While we cannot predict when or where a substitute teacher will face a situation in which a child's health or safety is at stake, we know with confidence that these situations will occur. There are many, many students in our nation's public schools: some 50.7 million of them this fall. See Fast Facts, National Center for Education Statistics, https://nces.ed.gov/FastFacts/. It takes no complex

28

statistical formulation to recognize that serious emergencies arise all the time in the classroom and in the school yard: kids get sick, injured, or into fights. The public schools take prophylactic steps to ensure, as best they can, the safety of their charges. By law, each district school board in Florida must establish policies and procedures for safety, including safety training and risk assessment. Fla. Stat. § 1006.07. Some required precautions help schools prepare for particular emergencies, like Florida's requirement that schools with athletics programs have an automated external defibrillator available and ensure training in its operation. Id. § 1006.165. More generally, an obvious and basic step necessary to ensure student safety is ensuring that the guardian in closest daily contact with students is able to respond, and to do so promptly and without any cognitive or physical impairment.

If schools are going to be able to handle emergencies that threaten children's safety, teachers will need to be able to identify and respond to emergencies quickly, decisively, and with sound judgment. To take one example among the many dangers that will arise, we know for sure that kids get sick. A child's illness may be benign or can be anything but benign. A child's fever may quickly develop and spike -- it could be nonexistent in the morning and yet require medical attention before the end of the school day. A student may develop a life-or-death allergic reaction even more rapidly. The Centers for Disease Control and

29

Prevention reports that four to six percent of children in this country have food allergies, often to foods as ubiquitous as peanuts, and their reactions may be life-threatening if not addressed quickly.  Food Allergies in Schools, Centers for Disease Control and Prevention, https://www.cdc.gov/healthyschools/ foodallergies/index.htm ("Early and quick recognition and treatment can prevent serious health problems or death.").  There may be no time to waste in seeking help.  Nor is there time to waste when a child falls into diabetic shock or suffers a seizure, fainting spell, or asthma attack.

Teachers must also expeditiously recognize and respond to violent situations.  The hard fact of life is that during school hours, bad things can happen to kids, and those front-line responders most directly supervising students -- our teachers and substitute teachers -- must be able to respond properly.  It is not remote, idle, or fanciful to posit with some confidence that students, particularly teenagers, will engage in conflict at school.  When students get into fights, a teacher will likely be in the best position to stop it, to diffuse it before it turns serious, or to seek help if the situation intensifies.  Sadly, we need only look to recent events to know that teachers may, at a moment's notice, become those most readily able to protect our students from deadly and immediate harm from outside the school as well.  School shootings are a real and palpable possibility.  They are not so remote as to be only a hypothetical: in the first half of this year alone, school

shooting incidents resulted in nearly three dozen deaths and numerous injuries. Denisa R. Superville & Evie Blad, A Deadly School Year: 35 People Killed in School Shootings, Education Week, May 28, 2018, https://www.edweek.org/ew/ articles/2018/05/30/a-deadly-school-year-35-people-killed.html.

As acute situations arise, and we know they will, the danger posed by leaving children, especially young children, in the care of an intoxicated teacher is profound.  A teacher under the influence of drugs is significantly less likely to respond promptly, efficiently, and with sound judgment than a sober and clearheaded teacher.  As we have said, it is not particularly likely that intoxicated teachers will regularly find themselves in front of a classroom.  In some instances, if a teacher arrived at work high or drunk, a coworker might notice that something was wrong and would intervene -- but we will not require the School Board to count on this, just at the Supreme Court did not rely on railroad workers to report one another.  Since the School Board considers this a danger to be guarded against, we will consider their proposed solution, rather than waving away the problem.

The probability of harm is significant because it is a function not only of the relatively small chance of an intoxicated teacher in the classroom but also of the much larger chance that an emergency will occur.  If a teacher who is responsible for the wellbeing and safety of a classroom of students is intoxicated on the job, there is a very realistic probability that a serious situation requiring a swift and

31

effective adult response would emerge.  Thus, we consider the gravity of the harm that could befall a child -- not to mention that child's family -- if the theoretically responsible adult fails to respond properly.  See Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ., 158 F.3d 361, 373 (6th Cir. 1998) (considering "the magnitude of the harm that could result from the use of illicit drugs on the job" as an element of the government interest in suspicionless drug testing of teachers).  Even though we accept a low probability of an impaired teacher leading a classroom, the result of our calculus is that teachers, including substitutes, who are drug-addicted pose a real danger to our schoolchildren.

Friedenberg acknowledges the gravity of the risk, but she argues that the risk is purely hypothetical and speculative.  We think she's wrong about the probabilities of harm, but, in any event, profoundly mistaken when we also consider -- as we must -- the gravity of harm.  We know with a high degree of confidence that serious problems will arise, that substitute teachers just like permanent teachers are the first and primary line of protection for minor students in the care of the public schools, and that an intoxicated guardian may well be unable to respond properly and promptly.  See Chandler, 520 U.S. at 319.

The danger that would be posed by drug-using individuals overseeing our classrooms is, we think, concrete and substantial.  The government, therefore, has a significant safety-based interest in regulating the conduct of teachers to ensure

32

safety in the public schools.  See Skinner, 489 U.S. at 620 (finding, in the railroad context, a "[g]overnment[] interest in regulating . . . to ensure safety, like . . . its operation of a government office, school, or prison") (quoting Griffin, 483 U.S. at 873–74).  While we fully accept that teachers are different from train drivers, Customs Officials, and law enforcement officials who carry firearms, we think the special need is similar in kind and at least as compelling.  Teachers might not reliably face the life-and-death stakes that these other government employees will, but we cannot guarantee that schools will be as safe as we hope.  In Von Raab, the Court found testing was justified because "a momentary lapse of attention can have disastrous consequences."  Von Raab, 489 U.S. at 670 (quoting Skinner, 489 U.S. at 628).  The same is true in a school environment.  We don't know that disastrous consequences would necessarily occur if a drug-using teacher were supervising a classroom, but the government has a powerful interest in not taking that chance.

Common sense yields this conclusion.  Running through relevant Supreme Court precedent is the idea that "special needs" may be observed because of an innate understanding of the problem presented.  There was no evidence, empirical or otherwise, about an existing drug problem cited in Von Raab, yet the Supreme Court still said it was reasonable to test Customs Officials, whether they were involved in interdiction or carried firearms.  See Von Raab, 489 U.S. at 674–75.  The need for testing was undergirded by an intuitive sense of the danger that drug-

33

using Customs Officials would pose, not by hard and demonstrable evidence. And again the Court highlighted that risk entailed both the likelihood that a serious harm will arise and the gravity of the harm. See id. (noting that even though "all but a few of the employees tested are entirely innocent of wrongdoing," the testing regime was valid, in part because "the possible harm against which the Government seeks to guard is substantial")

Although we rely heavily on the safety-sensitive Supreme Court precedents -- Von Raab and Skinner -- we also draw support for our conclusions from the cases addressing the drug-testing of students. These cases also establish that the government possesses far-reaching power in the unique setting of a school. The Fourth Amendment does not have equal force in the context of a school, owing to the strong government interest in maintaining order and creating an environment conducive to learning. See Vernonia, 515 U.S. at 656 ("Fourth Amendment rights . . . are different in public schools than elsewhere . . . ."); T.L.O., 469 U.S. at 338–40. These cases concerned the Fourth Amendment rights of students, who are compelled to attend school, not adults, but, to the extent that these cases are concerned with drugs in schools, as opposed to student drug use more specifically, the same disruption could result from teachers' drug use. E.g., Vernonia, 515 U.S. at 662 ("[T]he effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is

34

disrupted."). As our Court has pointed out, the unique concerns present in public schools are longstanding, and the primary concern is with protection: "[S]chool safety undoubtedly has always been a chief concern of teachers and administrators." Boim v. Fulton Cty. Sch. Dist., 494 F.3d 978, 984 (11th Cir. 2007).

Teachers are not students, over whom the state acts in loco parentis, see Vernonia, 515 U.S. at 655, but they are government employees. In Ortega, the Court said that "[t]he governmental interest justifying work-related intrusions [on privacy] by public employers is the efficient and proper operation of the workplace." Ortega, 480 U.S. at 723. The search in Ortega was less invasive than a drug test, but something of the same principle carries over. The school is the teacher's workplace, and the School Board's interest in testing relates entirely to the "efficient and proper operation of the workplace," not to a detached interest in the circulation of controlled substances. See id. at 724 ("In contrast to law enforcement officials, . . . public employers are not enforcers of the criminal law; instead, public employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner.").

Reasoning along similar lines, the Sixth Circuit has addressed and upheld the suspicionless drug-testing of public school teachers. Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ., 158 F.3d 361 (6th Cir. 1998). That court spoke in no

uncertain terms about the special needs presented in our schools.  It too emphasized the compelling nature of the government interests involved, observing that it could "imagine few governmental interests more important to a community than that of insuring the safety and security of its children while they are entrusted to the care of teachers and administrators." Id. at 374–75.  The Sixth Circuit looked at the unique responsibilities placed on our teachers as well -- to protect the students they serve, to respond with alacrity to the variety of problems as they arise, and to ensure an environment conducive to learning.  Id.  Additionally, the Sixth Circuit noted that teachers acted as role models, and their actions readily affect the "perceptions, and thoughts and values" of students.  Id. at 375 ("[T]eachers occupy a singularly critical and unique role in our society in that . . . they occupy a position of immense direct influence on a child, with the potential for both good and bad.")

As we see it, then, the suspicionless testing of substitute teacher applicants addresses many of the risks that we have outlined.  For one, routine testing of provisionally hired substitute teachers provides a layer of protection to ensure that the guardians, the front line responders in direct control of the classrooms, are alert and capable.  If applicants are using drugs during the job application process, we think it altogether reasonable for a school district to be suspicious of what could happen once they assume the job -- indeed, the school district would be seriously

36

remiss in placing children in the care of such individuals without at least being informed of the nature of their drug use. What's more, it also seems to us that the school district may reasonably seek to impress upon its substitute teachers the importance of protecting the classroom environment and the school. We recognize that the policy only allows for testing once, on the front end of the job hiring process and before the substitute teacher may take up her place in front of a classroom. But this still has a salutary effect and is prophylactic, telling all prospective substitute teachers that drugs are not tolerated in the schools. Through this regime, the school district undeniably sends a powerful message and builds in an additional layer of deterrence.

Moreover, the state has an independent interest in keeping drug users out of schools stemming from its "custodial and tutelary responsibility for children." Vernonia, 515 U.S. at 656. Vernonia identifies the government's role in schools as being "in loco parentis." Id. at 655. This simply means that the government is "acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent." In loco parentis, Black's Law Dictionary (10th ed. 2014). There is a "part of [this] parental authority" that means the power of "restraint or correction," see Vernonia, 515 U.S. at 655 (quoting 1 W. Blackstone, Commentaries on the Laws of England 441 (1769)), but, significantly, a parent's power and responsibility is multi-faceted and comprises much more than just that.

37

Concurring in Earls, Justice Breyer explained that, in this role, schools "shoulder the burden of feeding students . . . offering before and after school child care services, and providing medical and psychological services." Earls, 536 U.S. at 840 (Breyer, J., concurring) (quotations omitted). More broadly, they "prepare pupils for citizenship in the Republic [and] inculcate the habits and manners of civility." Id. (quoting Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681 (1986) (alteration in original)). The in loco parentis status of school administrators does not give rise to a constitutional "duty to protect," Vernonia, 515 U.S. at 655, but it has a protective element nonetheless, especially insofar as that protection relates to influences that are seen as immoral, e.g., Fraser, 478 U.S. at 684 (referencing "the obvious concern on the part of parents, and school authorities acting in loco parentis to protect children . . . from exposure to sexually explicit, indecent, or lewd speech"). Whether we view it as a matter of physical protection or a matter of value-inculcation, we think that schools have a meaningful interest in keeping active drug users -- including teachers -- away from their students.

We recognize that there is a difference between a substitute teacher and a full-time classroom teacher. And, we note, the sufficiently compelling special need we recognize today is limited to the question before us: drug testing of provisionally hired substitute teachers. Substitute teachers, compared to full-time classroom teachers, may receive more regular supervision, which increases the

38

potential that some school official may recognize when something is wrong with the substitute teacher. But at the end of the day, there is no real distinction between the responsibilities assumed by substitute teachers and full-time classroom teachers except for the amount of time they spend in the classroom. Substitute teachers, just like regular teachers, are the first responders in the classroom, and serve as the primary (and frequently only) caretakers for young children under the government's guardianship during the time they are at work. Their basic obligations are the same: to safeguard and teach those in their care.

Today we are asked to consider only the testing of substitute teachers, but we do not think that by recognizing a special need in this unique setting we have opened the floodgates to indiscriminate suspicionless searches. We have always required, as we do today, an exceptional showing of a special need to allow a suspicionless search, and not all government jobs present the same needs. We have repeatedly observed that the "special needs" calculus requires a careful, case-by-case examination of whether the duties and responsibilities surrounding the job are compelling enough to justify the invasion of privacy. In every case, the court must weigh privacy interests against the government's need. In some cases, depending on the job, a government employer might only have justification sufficient to support searching a workspace, as in Ortega. In other cases, as here, a more invasive search will be justified, possibly for similar safety reasons.

39

Courts are well-positioned to make these determinations and draw these distinctions on a case-by-case, job-by-job, search-by-search basis.  Indeed, in AFSCME v. Scott, 717 F.3d 851 (11th Cir. 2013), when Florida's Governor signed an executive order requiring periodic, random, suspicionless drug-testing of all eighty-five thousand state employees, we required the district court to make just this kind of specific examination -- to review categorized lists detailing every type of state job.  We directed the district court to make specific findings by first examining the State's purported need to test each employee in each category of job, and then to carry out the balancing test demanded by the Supreme Court for each category.  Id. at 872.  We said that this sort of "fact-intensive line-drawing" is precisely the role of courts.  Id.; see also Bangert v. Hodel, 705 F. Supp. 643, 649 (D.D.C. 1989) ("Obviously, the governmental interests at stake vary with particular positions, some of them implicating interests of various strengths in worker and public safety, workplace efficiency, and security.").

Our courts are quite capable of distinguishing between the needs presented in different factual settings.  We think a court can reasonably draw the line between a substitute teacher and another employee, say a janitor who simply cleans a school building in the evening, whose responsibilities do not involve safety and security, relate far less directly to students, involve profoundly different risks, or implicate more persuasive countervailing concerns.  But when we examine the

40

responsibilities of substitute teachers, we see the compelling interests the Supreme

Court has identified in the public schools -- the protection of children, the

maintenance of a proper educational environment, and proactive efforts against

student drug use including through good role modeling.  These responsibilities are

all uniquely vested in teachers, both substitute and permanent.  And this is far from

the broad testing regime rejected in Chandler.  Here, the setting is unique, and the

Supreme Court has recognized the uniqueness of the public school context.  The

state's concern is not the general enforcement of its penal laws but a proactive,

protective, and tutelary concern for students.  See Chandler, 520 U.S. at 320

(finding "no reason why ordinary law enforcement methods would not suffice to

apprehend such addicted individuals").

Friedenberg objects, however, that the causal relationship is not direct

enough between an intoxicated substitute teacher's delayed reaction time in the

case of an emergency and the possibility of harm to a child in the care of the state.

But this wouldn't be the first time that causation is multiple and complex.  Front-

line responders in this unique setting likely will be called on to solve the problem,

navigate around a dangerous and unfolding event, break up a fight before it

escalates, seek out emergency medical treatment, or provide direction and as much

protection as possible if an unthinkable emergency occurs.  Thus, we conclude that

41

there is a powerful special need in this unique setting justifying the imposition of a suspicionless drug testing regime for substitute teacher applicants.

V.

Once a special need has been established, controlling precedent requires that we weigh the competing private and government interests implicated by the search. We must evaluate the reasonableness of the search by "balanc[ing] the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." Von Raab, 489 U.S. at 665–66. At the balancing stage, once the government has carried its burden of establishing the special need, the burden returns to the plaintiff to persuade the court that the balance weighs in its favor. See AFSCME, 717 F.3d at 880. The Supreme Court has laid out four factors to be used in conducting this balancing: the strength of the individuals' expectation of privacy, measured in light of their chosen profession or special status; the nature and extent of the testing regime's intrusion on privacy; the nature of the government's special need; and the testing regime's efficacy at achieving the government's aims. A showing of an existing problem "would shore up an assertion of special need for a suspicionless general search program." Chandler, 520 U.S. at 319; see also Earls, 536 U.S. at 835. But the government need not

present empirical data concerning the extent of a drug problem peculiar to the group it seeks to test. See Earls, 536 U.S. at 835; Von Raab, 489 U.S. at 660–61.

In making this calculus we are satisfied that the intrusion on privacy has been reasonably minimized by the School District and that the reasons offered for the search are compelling. Again, it comes down to the fact that schools are different. Reasonable expectations of privacy depend on circumstance, and the government is justified in demanding more from those to whom our country's children are entrusted.

## A.

The first factor we consider is the nature of the privacy interest at issue. Vernonia, 515 U.S. at 654. "In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." Ortega, 480 U.S. at 719–20. The expectation of privacy is real and not insubstantial, but expectations will differ as context changes, and the public schools are unique. Individuals who choose careers working with children, particularly teachers in our public schools, enter a heavily regulated field with diminished privacy expectations. In fact, the Supreme Court has expressly recognized that "in an industry that is regulated pervasively to ensure safety" there are lessened expectations of privacy. Skinner, 489 U.S. at 627.

As the Court first explained in T.L.O. and reiterated in Vernonia and Earls, expectations of and interests in privacy are diminished by the unique context of schools. T.L.O., 469 U.S. at 340 ("[T]he school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject."); Vernonia, 515 U.S. at 656 ("Fourth Amendment rights . . . are different in public schools than elsewhere . . . ."); see also Earls, 536 U.S. at 830–32. These cases all addressed searches of students, not teachers, but the school environment is the same. Just as "the preservation of order and a proper educational environment requires close supervision of schoolchildren," T.L.O., 469 U.S. at 339, the same needs require closer supervision of some adults than might be permitted in other areas of government employment not presenting the same safety concerns.

The field of public education is pervasively regulated in order to protect the students and to promote learning. Thus, for example, teachers and substitutes may be required to undergo criminal background checks (as they are required to do in Palm Beach County), or to obtain professional certifications of their fitness to oversee a classroom. See, e.g., Knox Cty., 158 F.3d at 384. Florida also requires that all first-time substitute teachers complete additional training in "classroom management skills and instructional strategies." Fla. Stat. § 1012.35(b). And both the state and the School Board require fingerprinting of all new hires. Id. § 1012.39(1)(a). Moreover, since they place their belongings in classrooms, open

44

to numerous people throughout the day, teachers already have a diminished privacy interest in those belongings. Cf. Ortega, 480 U.S. at 722 (holding that requiring a warrant for government employers' work-related searches of employees' workspaces "would seriously disrupt the routine conduct of business and would be unreasonable"). And substitute teachers, in particular, precisely on account of their temporary role, may expect that they will be subject to closer scrutiny.

Bodily privacy is a different matter, but, where employees have safety-related reasons to inquire into their employees' physical wellbeing, the Court has upheld intrusions on even this. The Court has "not suggest[ed] . . . that the interest in bodily security enjoyed by those employed in a regulated industry must always be considered minimal." Skinner, 489 U.S. at 628. In Skinner, privacy interests were diminished because railroad regulation had in part focused on employee bodily fitness -- for example by requiring physical examinations for certain employees. Id. The Customs employees in Von Raab also had to "expect effective inquiry into their fitness and probity." 489 U.S. at 672; see also Vernonia, 515 U.S. at 657 (finding diminished expectations of bodily privacy for student athletes because they had to submit to physical exams). Here the School Board has provided a similarly safety-related reason for invading teachers' bodily privacy -- it needs to know whether they use drugs before placing them in front of a classroom.

45

Teachers plainly step into a unique setting heavily regulated by the state on account of its profound social importance to the well-being of the nation.  Given the unique role that teachers, including substitutes, play in this environment, we cannot say that they have the same privacy interests as adults in more typical contexts or even other government employees in similar contexts (i.e. janitors or some administrators).  See AFSCME, 717 F.3d at 882 (suggesting that the balancing test must be conducted in a position-specific way).  Thus, it does not go too far to say that teachers have a diminished privacy interest in this unique setting.

### B.

"Having considered the scope of the legitimate expectation of privacy at issue here, we turn next to the character of the intrusion that is complained of."  Vernonia, 515 U.S. at 658.  Again, a urine drug test implicates privacy interests.  See, e.g., Skinner, 489 U.S. at 617.  The privacy interests are different in character than the interests implicated by a search of one's home, one's person, or one's personal belongings.  Though urine drug testing requires those tested "to perform an excretory function traditionally shielded by great privacy," the invasiveness of the test is reduced measurably when the procedures employed "endeavor to reduce the intrusiveness of the collection process."  Id. at 626.  The privacy invasion presented by urine collection may be minimal where, for example, the testing site

46

emulates situations generally encountered in a public restroom.  See Vernonia, 515 U.S. at 658.

The testing regime employed by the Palm Beach School District is similar to those the Supreme Court has deemed "minimally intrusive." Earls, 536 U.S. at 834.  In Earls, urine collection took place in a private stall, with a monitor listening from the outside for abnormal sounds.  Id. at 832–33.  Similarly here, collection could take place in a stall or protected area with a monitor listening from the outside for abnormal sounds in order to detect tampering.  See Fla. Admin Code. R. 59A-24.005(3)(c)7; Earls, 536 U.S. at 832–33.  And in Earls, the results of the testing and any self-disclosed information about prescription medications were held confidentially, were only released on a "need-to-know" basis, and, perhaps most notably, were not released to law enforcement.  See Earls, 536 U.S. at 833. Likewise, here the test results are not revealed to law enforcement, are maintained in confidential files only accessible by a few individuals, and are disclosed to the direct managers of the applicant only to reveal that the applicant did not pass a medical examination.  In other words, the results are released in a limited way and only on a need-to-know basis.  The Supreme Court has also approved policies that, like the regime here, check the urine sample for tampering. E.g. Vernonia, 515 U.S. at 650; see also Earls, 536 U.S. at 832.

47

Only two minor components of the School District's testing regime implicate intrusions beyond what the Supreme Court has deemed to be minimally intrusive. First, the School District's policy allows for searches of a drug-tested individual's wallet for evidence of tampering supplies, if the applicant chooses to keep the wallet on his person during the collection. Fla. Admin Code. R. 59A-24.005(3)(c)(5). This additional step appears to us to be narrowly pointed at preventing the use of tampering supplies, and a search of the wallet may be avoided by placing the wallet with the rest of one's belongings outside the stall. Second, the disclosure of medications before testing, as is required by the testing regime, was a consideration that raised "some cause for concern." Vernonia, 515 U.S. at 659. Still, where there was every indication that the information about the lawful use of medication would be kept confidential, as there is in this case, the pre-test disclosure was "not view[ed] . . . as a significant invasion of privacy." Skinner, 489 U.S. at 626 n.7.

Overall, the drug-testing program employed by the School District is the type of intrusion the Supreme Court has found minimally invasive. The procedures for collection are fully consonant with those that have been approved in the past. In the face of these procedures, "the privacy interests compromised by the process of obtaining the urine sample are in our view negligible." Vernonia,

515 U.S. at 658.  We are, therefore, satisfied that the privacy invasion caused by the School District's testing regime is a minimal one.

## C.

Next we consider "the nature and immediacy of the governmental concern at issue here."  Vernonia, 515 U.S. at 660.  As we have explained in detail, supra, we think the government has a compelling interest.  The government's essential interest in drug testing substitute teachers is to weed out applicants who abuse drugs in order to better achieve the basic safety and tutelary obligations of our schools.  Again, teachers, including substitutes, are the School District's front line agents.  They serve as the guardians of school students throughout the school day.  The drug testing regime functions prophylactically to help ensure that substitute teachers will not be impaired.  Indeed, the very preventative nature of the search counsels in favor of its constitutional authorization: "The probable-cause standard . . . may be unsuited to determining the reasonableness of administrative searches where the 'Government seeks to prevent the development of hazardous conditions.'"  Earls, 536 U.S. at 828 (quoting Von Raab 489 U.S. at 668).

As we have explained at some length, the safety of schoolchildren and the maintenance of an environment in which education could take place are compelling government interests.  The Supreme Court's previous student drug-testing cases confirm this.  The unique concerns presented in public schools and

involving the custodial care of children "should not disappear from the analysis of special need simply because the drug testing is of a school employee rather than a student." Again, we determine that the government interests implicated today are weighty. And the government's interests also present sufficient immediacy. The Supreme Court itself has recognized as "an immediate crisis" the large-scale problem of drug addiction. Vernonia, 515 U.S. at 662–63. But the empirical demonstration of a drug problem is not a necessary element to every suspicionless drug search. See id.

We conclude that the School District has presented a compelling need with sufficient immediacy. In T.L.O., Justice Blackmun wrote of the "special need for an immediate response to behavior that threatens either the safety of schoolchildren and teachers or the educational process itself." T.L.O., 469 U.S. at 353 (Blackmun, J., concurring in the judgment). This testing regime, we think, provides the kind of immediate -- that is, proximate -- response to the threat posed by drug-using teachers. The School District could reasonably conclude, as it obviously did, that testing at a later date, after a problem is uncovered and while a substitute is already standing in the front of a classroom, would not adequately protect schoolchildren.

50

D.

Finally, we consider the efficacy of the School District's testing regime. The mere fact that a drug test could conceivably be "beaten" by abstaining from drugs for a significant enough period of time does not necessarily render the test ineffective; Von Raab squarely rejected that argument. 489 U.S. at 676. Our inquiry is only into whether the testing regime is "an effective means of deterring" the undesirable behavior it targets. See Skinner, 489 U.S. at 629. We are not required to determine whether the current testing regime is the most effective possible means of keeping drug-using teachers out of the classroom. The Supreme Court has rejected that idea too, see, e.g., Vernonia, 515 U.S. at 664 n.3, and it would be strange indeed to fault an effective drug-testing regime in this unique setting simply because the testing could be more frequent and more intrusive. Repetitive drug testing after hiring might be more efficacious, but we cannot demand that the School District design the single most effective regime. We are only required to find a "reasonably effective means of addressing the School District's legitimate concerns." Earls, 536 U.S. at 837. A more intrusive regime would also place greater burdens on the Fourth Amendment's protections against invasions of privacy and would require a different application of the balancing test.

Friedenberg relies on Chandler, where the Court struck down a testing regime for candidates for state office, in part because it was glaringly ineffective

51

and offered no realistic prospect of identifying any drug users over and above those who would likely be deterred already by the public scrutiny that comes with running for office. See Chandler, 520 U.S. at 319–20. But Chandler is distinguishable. For one thing, the hazards described by the state were characterized by the Court as being "hypothetical," not real or concrete. Id. at 319. For another, the testing regime there allowed candidates to schedule their own tests and gave them a thirty-day window to do so. Id. The defendant conceded that, with that much control, nearly all drug users would be able to abstain from drug use long enough to pass the test. Id. at 320. The Palm Beach County School Board has made no comparable concession.

Here, the applicants have less control over when they are tested. Applicants cannot control when their applications are reviewed or when they receive conditional job offers. They must then undergo testing before New Employee Orientation (NEO), which the district court found was "set for a date certain." The record is not altogether clear on this point. Friedenberg said she received a conditional offer on February 21 and was scheduled for NEO on February 27, giving her less than a week to schedule her test. The School Board's director of recruitment and retention said under oath at her deposition that teachers "typically" must go to the first possible NEO and that the School Board "like[s] to make sure

52

that they come" to that first possible date, as scheduled by the School Board.[3]

However, she also said, in an earlier declaration, that the NEOs were available

each week in March and April, and that Friedenberg could attend her NEO "on a

later day or complete it online" if she passed a drug test or if the school board was

prohibited from enforcing the policy by Court order.  We see no clear error in the

resolution of this apparent inconsistency and think that applicants here have

substantially less ability to manipulate the test scheduling than the candidates in

Chandler.

Moreover, we can say with confidence that the second consideration drawn

from Chandler, the role of public scrutiny in discouraging drug users from running

for office, is not present here.  Substitute teachers are not subject to the kind of

intense public scrutiny -- "relentless scrutiny—by their peers, the public, and the

press," in the words of the Supreme Court -- that candidates for state office face.

Chandler, 520 U.S. at 321.  In fact, the district court found that even school

---

[3] Her testimony was as follows:

> Q.   When a substitute teacher is given a conditional job offer and they fulfill all the requirements that are remaining such as the drug test, then they need to go for a new orientation; right?
> A.   Correct.
> Q.   Do they typically need to go to the net new orientation?
> A.   Yes.
> Q.   Okay.  They can't just say, oh, well, you know, I'll attend one in a few months?
> A.   No.  We like to make sure that they come.  They're scheduled is how we have it right now. [*sic*]

principals have only limited opportunities to observe substitute teachers. Since substitute teachers will be largely unobserved once they are hired, it seems to us that a drug test on the front end likely has far more deterrent value here than it did in Chandler.

## VI.

The long and the short of it is that we are satisfied that the testing regime adopted by the Palm Beach County School Board serves a preventive and deterrent function. When we balance all the interests as we are required to do, the School Board clearly has carried the day. Friedenberg has a diminished privacy interest owing to the unique Fourth Amendment context of the public schools. Plainly, the School Board has made only a minimal intrusion on that privacy interest. It has done so in the service of a serious and compelling need. And the testing regime appears to us be reasonably effective and altogether reasonable. Friedenberg has not established a substantial likelihood of success on the merits. On this preliminary record, and on these facts, we can discern no abuse of discretion in the district court's denial of a preliminary injunction.

**AFFIRMED.**